IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 20-cv-03179-MEH

ESTER C. ONEAL,

     Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,

     Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiff Ester C. Oneal appeals from the Social Security Administration ("SSA") Commissioner's final decision denying her application for Social Security Disability Insurance ("SSDI"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401–433, and her application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83c. Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and it would not materially assist the Court in its determination of the appeal. After consideration of the parties' briefs and the administrative record, the Court affirms the Administrative Law Judge's ("ALJ") decision.

## BACKGROUND

### I.    Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying her applications for SSDI and SSI filed on July 10, 2017. Administrative Record ("AR") AR 217–236. After the applications were denied initially on September 18, 2017 and again upon reconsideration on

December 1, 2017 (AR 68–115), the ALJ scheduled a hearing at Plaintiff's written request for April 24, 2019 (AR 35), at which Plaintiff was represented by counsel, and Plaintiff and a vocational expert testified. AR 35–67. The ALJ issued a written ruling on May 17, 2019 finding Plaintiff was not disabled starting on March 13, 2017 because, considering Plaintiff's age, education, work experience, and residual functional capacity, Plaintiff was capable of working in the same jobs she previously had. AR 10–18. On April 28, 2020, the SSA Appeals Council denied Plaintiff's administrative request for review of the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial review. AR 1–3. *See* 20 C.F.R. § 404.981. Plaintiff timely filed her Complaint and Petition for Review with this Court on October 23, 2020. ECF 1.

## II.    Plaintiff's Alleged Conditions

Plaintiff was born on February 17, 1962; she filed her applications for SSDI and SSI on July 10, 2017. AR 248. Plaintiff claims she became disabled on March 13, 2017 and reported that she was limited in her ability to work due to limited use of her left side, a fractured bone in her left foot/ankle, issues with the left rotator cuff, and pain. AR 252. No party disputes that Plaintiff's "date last insured" for purposes of social security benefits was December 31, 2021 (AR 71; AR 248); thus, Plaintiff must establish a "disability" on or before that date to be entitled to a period of SSDI and SSI. In describing Plaintiff's medical history, the Court will focus primarily on those records cited by the parties and the ALJ in this case.

On March 8, 2016, while working, Plaintiff tripped on a curb and fell, injuring herself. AR 53. Her first medical appointment after this fall occurred on March 15, 2016 when she went to see Charles D. Rhodus, M.D. AR 474. At the appointment, Plaintiff complained about her foot and ankle and rated the pain as an eight out of ten. *Id.* Dr. Rhodus took x-rays, which revealed a

nondisplaced fracture of the fourth metatarsal bone in Plaintiff's left foot, contusion of the left foot, an osteophyte in the left foot, and arthritic changes. *Id*. Treatment included the application of a compression dressing and giving Plaintiff a Darko shoe. AR 475.

Including that initial visit, Plaintiff saw Dr. Rhodus on nine occasions: March 30, 2016 (AR 476–77); May 3, 2016 (AR 478–79); June 8, 2016 (AR 480–81); August 3, 2016 (AR 482–83); February 10, 2017 (AR 484–85); February 28, 2017 (AR 486–87), and August 23, 2017 (AR 488–89). On March 30, 2016, Dr. Rhodus noted that there was "no warmth, swelling and/or bruising noted." AR 476. This note is repeated for each of the other visits. On May 3, 2016, Dr. Rhodus ordered an "Exogen bone growth stimulator for delayed union of fourth metatarsal fracture." AR 479. He also prescribed Tylenol with codeine and encouraged Plaintiff to continue walking in the fracture boot and proceed with therapy. *Id*. On June 8, 2016, Plaintiff noted a decrease in pain, rating it a five out of ten. AR 480. Dr. Rhodus directed that Plaintiff continue with the Exogen bone growth stimulator, walking in the fracture boot, and therapy. AR 481. On August 3, 2016, Plaintiff returned with a chief complaint that she continues to have "pain and swelling" in her left ankle. AR 482. Dr. Rhodus repeated the order to continue the Exogen bone growth stimulator. AR 483. On February 10, 2017, Plaintiff complained that the swelling had increased the night before and requested "a fluid pill." AR 484. Dr. Rhodus noted that Plaintiff was "to wear the ankle brace with working" and "[m]ay have work release for 2/12/2017." AR 484.

On February 28, 2017, Plaintiff returned to Dr. Rhodus complaining that she has been "in her walking boot off and on for a week now" because the swelling would become too much. AR 486. The pain returned to an eight out of ten on this visit. *Id.* Dr. Rhodus ordered "for the patient to have limited weight bearing at work . . . [and] for temporary handicap placard and work

parking." AR 487. At the August 23, 2017 appointment, Plaintiff explained that her pain had raised to a nine out of ten and that her left foot and ankle were swelling, but that "she doesn't take Tylenol and codeine." AR 488. Dr. Rhodus reiterated that Plaintiff should have limited weight bearing at work and prescribed her four different medications. AR 489.

Plaintiff saw David J. Carney, M.D., an orthopedic surgeon, from around May 2016 through April 2017. On May 13, 2016, Plaintiff saw Dr. Carney for the first time with complaints about her left knee, left shoulder, left ankle, and left foot, with the "biggest concern" being her ankle. AR 419. Plaintiff told Dr. Carney that she had four therapy visits regarding her shoulder which "may have helped her shoulder a little bit." *Id.* On examination, Dr. Carney noted that her shoulder had good range of motion with some pain and weakness with external rotation against resistance, her knee showed no swelling and had full range of motion and tenderness at the joint line medially, and her ankle demonstrated good ankle and subtalar movement with little tenderness over the fourth metatarsal. *Id.* Dr. Carney reviewed previous x-rays of various body parts and an MRI of Plaintiff's left shoulder which showed a torn rotator cuff tendon in the shoulder, mild osteoarthritis in the left knee, and a shaft fracture of the fourth metatarsal. AR 418. For the treatment plan, Dr. Carney noted that he believed "her metatarsal is healed." *Id.* Additionally, Dr. Carney recommended discontinuing wearing the boot but ultimately left it up to Plaintiff to decide. *Id*. Finally, he stated that "[t]here is nothing to do for her knee" and noted that she was seeing other doctors for her ankle and had a surgery scheduled for her shoulder.

On August 24, 2016, Plaintiff returned to Dr. Carney for a "[s]econd opinion for left shoulder problem." AR 417. Dr. Carney noted that Plaintiff had undergone rotator cuff tendon surgery by Dr. Matt Jones since the last time he had seen her. *Id.* In doing so, Dr. Carney also wrote that the problem with Plaintiff's left foot "for all intents and purposes, healed and all of her

concern today regards her left shoulder." *Id*. As to the shoulder, Plaintiff commented that she had multiple emergency room visits due to the pain. *Id*. On examination, Dr. Carney found that Plaintiff had "little or no active or passive movement" but had "some strength with external rotation against resistance." *Id.* Dr. Carney expressed that he did not know why Plaintiff had not progressed and did not "see how she can work considering her current situation." *Id*. A week later, Plaintiff called Dr. Carney asking for stronger pain medication, and Dr. Carney refused. AR 416.

On September 21, 2016, Plaintiff returned to Dr. Carney for a follow-up on the left shoulder. *Id.* Dr. Carney noted Plaintiff was "not doing well," but that she was still in a sling despite Dr. Carney asking her not to wear one. *Id.* On examination, Plaintiff again exhibited little or no movement in the shoulder. *Id*. Dr. Carney prescribed Norco 10/325 mg for pain and ordered an arthrogram. *Id.* On September 30, 2016, Dr. Carney reviewed the results of the arthrogram with Plaintiff. AR 415. Dr. Carney began by noting that Plaintiff was still in a sling and that she still did not move her arm. *Id.* The arthrogram showed "a significant leak." *Id*. Dr. Carney conducted an acromioplasty on the left rotator cuff tendon on October 20, 2016 and again prescribed Norco 10/325 mg. *Id.* At the post-op follow-up on October 24, 2016, Dr. Carney observed that Plaintiff's incision looked fine and for Plaintiff to continue using her sling. AR 414. On November 9, 2016, Plaintiff returned to Dr. Carney for another post-op follow-up and ordered that Plaintiff discontinue using her sling and return to doing therapy. *Id.*

Plaintiff restarted therapy on her shoulder at ETMC Rehab on November 15, 2016. AR 429. Plaintiff reported a pain level of six out of ten and a goal of "[f]ull recovery so [she] can go back to work." AR 429–30. The therapist observed apparent distress with passive range of motion of the left shoulder due to guarding and moderate to severe tenderness to palpation over the anterior and lateral left shoulder. *Id.* By December 2016, Plaintiff noticed some overall progress "but still

has significant pain with reaching as well as bathing/dressing" and a pain level of four to six out of ten. AR 426. The therapist noted that Plaintiff was "self-limiting at times and does not tolerate PROM." AR 427.

In January 2017, Plaintiff returned to Dr. Carney who observed that Plaintiff "is better," but "she still has problems with movement, especially active movement." AR 412. Based on her comments that therapy has not involved much movement, Dr. Carney ordered "more aggressive therapy" and encouraged Plaintiff to "get past" the pain during therapy. *Id.* At the end of the treatment note, Dr. Carney wrote, "[Plaintiff] cannot work at this time." *Id.* The therapy notes from February 1, 2017 indicated that Plaintiff was having good days and bad days, with more bad than good. AR 423. She told the therapist she could fold clothes with her left arm but could not use that arm to wash her hair, reach over her head, or lift. *Id.* But she also reported that therapy was helping a little such that she could now "do some light housework and washing dishes as long as it is at waist level." *Id.* On February 6, 2017, Dr. Carney examined Plaintiff again, recognizing her complaints of pain, decreased ranged of motion, and decreased strength. AR 411. Because previous treatment notes stated that Plaintiff got worse over time, Dr. Carney discontinued therapy. *Id.* Further, he is "going to allow her to return to work" because "[t]his has had plenty of time to heal and I feel that she can move on from this." *Id.*

On April 3, 2017, Plaintiff saw Dr. Carney again, this time for both her shoulder and her ankle. AR 410. He tried to examine her shoulder, but "she refused and pulled away from [him]." *Id.* He did not notice any swelling, and given her reluctance to let him examine her, the visit ended. *Id.* On April 19, 2017, Plaintiff returned to Dr. Carney for pain in her left shoulder and left ankle. AR 408. Dr. Carney "repeated the MRI of [Plaintiff's] shoulder at her request." *Id.* After he reviewed the images with her and told her that she no longer has a rotator cuff tear, "she then began

to complain about numbness in her arm and hand." *Id.* When she asked about some "test" to evaluate her numbness, Dr. Carney informed Plaintiff that he did not believe she could tolerate an EMG since "you can't even touch her shoulder to examine it." *Id.* Dr. Carney then moved to the left ankle and observed that Plaintiff wears a brace but does not tighten it up. *Id.* After examining the ankle, he found the exam to be unremarkable. *Id.* Dr. Carney concluded his treatment notes by not imposing any restrictions on Plaintiff and finding that she "does not require any further surgical intervention." *Id.*

Also in April 2017, Plaintiff went to UT Health Northeast for a well woman exam. AR 446. While there, she indicated a pain of seven out of ten for her left shoulder. *Id.* During her exam, she had labored breathing and decreased range of motion in her left shoulder. AR 448. She returned in June 2017 to go over the results from her previous visit. AR 441. She again reported a pain of seven out of ten for her left shoulder. AR 442. She stated that she continues to have pain despite Dr. Carney clearing her for work. *Id.* On examination, Plaintiff exhibited some decreased range of motion and strength in her shoulder but appeared generally comfortable. AR 443. Due to her continued reports of moderate to severe pain and indication that Dr. Carney "signed off on her case[,]" Plaintiff was given Norco "to bridge care." AR 444.

In March 2018, Plaintiff moved to Colorado Springs, Colorado and established care with Peak Vista as her primary care provider. AR 675–77. In her first appointment at Peak Vista, Plaintiff reported a pain of ten out of ten in her left shoulder. AR 675. Plaintiff asserted that she was unable to move her left arm. *Id.* On examination, Plaintiff was unable to lift her left arm above her waistline. AR 677. She also exhibited some symptoms of depression. AR 676. On a subsequent visit, in which Plaintiff reported cold-like symptoms, Peak Vista added hypertension as a diagnosis. AR 671. She returned to Peak Vista two weeks later for both her hypertension and her

shoulder pain. AR 664. Plaintiff indicated that her pain was a nine out of ten and that she had no range of motion on her left shoulder. *Id.* On examination, Plaintiff experienced pain with passive range of motion on her left shoulder. AR 666. Plaintiff did not exhibit any symptoms of depression on this visit. *Id.*

Around a month later, in April 2018, Plaintiff returned to Peak Vista for pain in her left shoulder and ankle. AR 660. Plaintiff asserted that her pain "is aggravated by sitting, walking and standing" with "no relieving factors." *Id.* Dr. Sarah Martin ordered x-rays of her ankle and referrals to orthopedics and podiatry due to lateral malleolar pain. *Id.* Dr. Martin noted that Plaintiff was experiencing symptoms of depression again. AR 662. Three weeks later, Plaintiff described an inability to sleep, and Dr. Martin prescribed 50 mg of trazodone. AR 657.

Plaintiff's next appointment at Peak Vista was in August 2018 at which she complained of pain in her left shoulder and ankle. AR 654. Plaintiff reported a moderate level of pain that was constant and fluctuating. *Id.* She described decreased mobility, joint tenderness, and weakness. *Id.* Plaintiff stated that she was unable to do her prior orthopedic referral because of her insurance. *Id.* At the end of August, Plaintiff had another appointment, this time to address a persistent cough. AR 650. Dr. Martin referred Plaintiff to gastroenterology. *Id.* When Plaintiff returned in September 2018, Dr. Martin noted several possible causes of Plaintiff's cough, including uncontrolled, mild, intermittent asthma. AR 646. Dr. Martin prescribed additional medications to help with the cough and nasal and sinus congestion. AR 647. Later in September 2018, Plaintiff was placed on a prednisone burst and referred to an asthma and allergy specialist. AR 642.

Plaintiff had three appointments at Peak Vista in November 2018, primarily for headaches attributed to her hypertension. AR 627, 632, 637. Plaintiff also had appointments in January and February 2019 concerning her insomnia and hypertension. AR 622.

On August 29, 2018, Plaintiff was examined by Marc Conner, D.P.M. of Davita Medical Group for a podiatry evaluation, AR 490. Plaintiff reported a pain level of nine out of ten. *Id.* Dr. Conner assessed a tarsal coalition of the left foot. *Id.* He conducted a cortisone injection in the left subtalar. AR 492. Around two weeks after seeing Dr. Conner, Plaintiff went to Lee T. Fleming, D.P.M. of Colorado Springs Foot & Ankle. AR 517. Dr. Fleming noted that Plaintiff reported no relief for her ankle from wearing a boot or an ankle brace, cortisone injections, NSAIDS, or narcotics. AR 518. He also noted that Plaintiff had pain with range of motion especially with inversion. AR 519. Dr. Fleming reviewed x-rays that show "talar beaking and large ant process." *Id.* An MRI showed "possible fibrosseus coalition of CN." *Id.* Plaintiff refused any further cortisone injection and requested surgery, but Dr. Fleming felt "the need to exhaust conservative measures [first]." *Id.* He diagnosed her with pes planus, left; degenerative joint disease of the ankle and/or foot; and complex tarsal coalition. *Id.* In an October 2018 visit, Dr. Fleming dispensed an ankle/foot orthosis because the one Plaintiff was wearing felt like it was "digging in the back of [her] leg." AR 516. Plaintiff reported a pain of three out of ten. *Id.*

On November 2, 2018, Plaintiff returned to see Dr. Fleming for ankle pain. AR 511. She felt pain in her left ankle which caused her to misstep and twist her right ankle. AR 513. Plaintiff surmised that x-rays would not show anything, so she wanted an MRI. *Id.* She reported her pain as a ten out of ten. *Id.* Dr. Fleming took x-rays which showed no fracture of dislocation. *Id.* He "advised CAM boot and MRI of the R ankle." AR 514. Plaintiff returned two weeks later to go over the MRI results which showed a "partially torn ATFL R and stress reaction of the cubold."[1] AR 511. Dr. Fleming "advised and gave a Swedo [sic] ankle brace." *Id.* On December 12, 2018

---

[1] As indicated elsewhere in the records, the MRI showed a single part lateral ankle sprain, partially torn anterior talofibular ligament, and diffuse swelling. AR 524.

Plaintiff returned to Dr. Fleming for pain in her left ankle. AR 507–09. Plaintiff reported pain "on the inside and the outside" of her ankle attributable to Plaintiff walking on that ankle more because of the recent trouble with her right ankle. AR 509. Plaintiff indicated her pain was a ten out of ten. *Id.* On examination, Dr. Fleming noted "[p]es planus with TTP over the PT and peroneals." *Id.* He ordered an MRI of the left ankle which showed "some peroneal tendinitis and pesudocysts of the STJ." AR 506.[2] Dr. Fleming gave Plaintiff a cortisone injection. AR 507. Plaintiff later reported that the injection made her ankle worse to the point in which she could not walk on it for almost three days. AR 504. Plaintiff reported a pain level of eight out of ten. *Id.* Dr. Fleming told her he had "no other options for her." *Id.*

For pain management, Plaintiff was referred to Gorman Medical, and her first appointment was on April 16, 2018 for pain in her left ankle and left shoulder. AR 556. Plaintiff reported a pain of eight out of ten. *Id.* She described the pain as constant, sharp, burning, aching, and stabbing. *Id.* She continued that the pain caused her to get "hardly any sleep," lack of an appetite at times, lack of physical activity, and missing "out on relationships with others." *Id.* She recounted some medicines she had tried but indicated that she was taking "nothing for pain." *Id.* On examination, Plaintiff experienced acute distress due to pain. *Id.* Plaintiff was diagnosed with chronic pain syndrome, pain in the left shoulder, and pain in the left ankle. AR 557. An MRI of the left shoulder and an MRI of the left ankle were ordered, and Plaintiff was prescribed hydrocodone 5/325 mg tablets. *Id.*

At the pre-MRI arthrogram CT, it was noted that the "exam was technically difficult because of severe patient pain and inability to maintain the normal position for arthrography." AR

---

[2] The MRI also showed subtalar inflammation and mild arthropathy; stress injury; mild tendinosis peroneus longus and bravis [sic] tendons; and tenosynovitis. AR 522.

584. In general, the MRI of the shoulder revealed that the rotator cuff repair was intact; no evidence of acute internal derangement; postsurgical changes in the acromioclavicular joint and acromion; and synovitis change within the injected fluid in the subacromial and subdeltoid bursa. AR 582–83. The MRI of the ankle generally showed apparent flatfoot deformity; possible fibrosseous coalition changes of the calcaneus and the navicular; degenerative changes sinus tarsi and calcaneus with synovitis change of the sinus tarsi contents; fluid tracks along the extensor retinacular margins and a ganglion cyst about the same. AR 579–80.

On August 1, 2018, Plaintiff returned for a pain management follow-up appointment and to review the results of her scans. AR 554. Plaintiff's pain level was a nine out of ten. *Id.* An EMG was ordered to be completed of Plaintiff's upper body for her shooting pain into her index fingers. AR 555. Opioids were put on hold given Plaintiff "had an excessive amount of alcohol that resulted in her last drug screen." *Id.* But she was prescribed tramadol 50 mg tablet for every six hours as needed for pain. *Id.* The treatment notes indicated that Plaintiff understood her treatment would be "palliative for her pain management as her current conditions will not resolve on their own and will progressively get worse over time without interventions." *Id.*

The EMG was done on August 7, 2018. AR 547. It "revealed right tarsal tunnel syndrome, left sural neuropathy, right and left peroneal neuropathy, right and left L5-S1 radiculopathy, [and] right CTS." *Id.*; *see also* AR 560–61. Plaintiff was instructed to use adjunct therapies for pain control, such as heat, ice, and mild exercise, as well as to limit use of narcotics. AR 553. The next day, Charles H. Ripp, M.D., P.C., examined Plaintiff. AR 549. Plaintiff rated her pain as a ten out of ten. *Id.* Dr. Ripp noted Plaintiff was wearing a left shoulder sling; periarticular left shoulder palpitation tenderness and positive impingement signs; 2+ peripheral edema; and significant left ankle periarticular palpation tenderness with brace present. AR 550. He assessed Plaintiff with

morbid obesity; history of recent significant alcohol intake; chronic pain syndrome with OA; anxiety/depression; status post two left RCR; chronic left ankle arthralgia; and hypertension. *Id.* On September 6, 2018, Plaintiff returned to Dr. Ripp and discussed the possibility of left ankle and shoulder surgeries. AR 547. Dr. Ripp prescribed MS-Contin 15 mg twice a day and added hyperalgesia to his assessment. AR 547–48.

Plaintiff had another appointment with Dr. Ripp on October 5, 2018. AR 544. She relayed that morphine helps her "but is not taking all the pain away." *Id.* Dr. Ripp warned her that "she is at the limits of analgesic medication due to her comorbidities." *Id.* At that appointment, Plaintiff rated her pain as eight out of ten. *Id.* In a follow-up appointment on November 3, 2018, Plaintiff stated the pain in both ankles was a ten out of ten. AR 541. The treatment notes indicate Plaintiff received multimodal therapy with injection, medications, counseling, and physical therapy recommendations regarding diet and exercise. *Id.* Plaintiff was experiencing pain with gastric bypass surgery. *Id.* When conducting his examination, Dr. Ripp noted the left shoulder had decreased range of motion with periarticular palpation tenderness; the left foot had a brace; and the left knee had some periarticular palpation tenderness. AR 542. Dr. Ripp discussed tap blocks with Plaintiff and instructed that she "cannot take anti-inflammatory agents due to her stomach Roux-en-Y condition with gastric bypass." AR 541. Plaintiff returned to Dr. Ripp in three weeks for injections and complaining of pain in her stomach. AR 538. Dr. Ripp updated his assessment to include obesity; chronic abdominal pain secondary to adhesions; hypertension; chronic opioid therapy; lumbar pain due to DDD facet arthrosis; spondylosis clinically; and osteoarthritis, diffuse. AR 539.

The record reveals Plaintiff had six other appointments with Dr. Ripp: December 6, 2018 (AR 535); January 5, 2019 (AR 533); January 26, 2019 (AR 530); February 12, 2019 (AR 528);

February 23, 2019 (AR 702); and March 23, 2019 (AR 699). At each appointment, Plaintiff complained about pain in either (or both) her ankle and shoulder with the pain level never going below eight out of ten. However, at the January 26 appointment, Dr. Ripp mentioned that Plaintiff "is doing well" and that "[s]he overall is improving and more functional." AR 530. The treatment notes from appointments after that do not contain such statements.

During her time with Dr. Ripp, Plaintiff also went to see Gary Simpson, D.O. at Centura Orthopedics. AR 591. The first visit occurred on October 12, 2018 at which Dr. Simpson assessed Plaintiff with posterior tibial tendonitis, left; morbid obesity due to excess calories; and posterior tibila tendinits, right. *Id.* He noted inflammation in the tendon which is "yielding a lot of pain along the medial border of the foot." *Id.* Dr. Simpson believed that, "[a]s with most cases, if we let this tendon rest it has an excellent chance of some recovery." *Id.* He did note that Plaintiff had "an [A]rizona brace that is not helping with her pain and may actually be too big." *Id.* On examination, Dr. Simpson found Plaintiff had an antalgic gait, a flatfoot deformity with marked abduction, and tender to palpation about the posterior tibial tendon. AR 594. Plaintiff reported a pain level of six out of ten at this appointment. AR 592.

Plaintiff returned to Centura Orthopedics on November 26, 2018 for left knee pain. AR 595. She was seen by Trisha Finnegan, NP, who assessed Plaintiff with chronic pain of left knee; primary osteoarthritis of left knee; and genu varum of left lower extremity. *Id.* X-rays were taken which showed left knee osteoarthritis with medial joint compartment narrowing with associated marginal osteophyte formation, sclerosis, and varus deformity. *Id.* When examined, NP Finnegan found mild swelling, abnormal range of motion, and a positive Valgus stress test. *Id.* Plaintiff received a left knee interarticular cortisone injection. *Id.*

On December 17, 2018, Plaintiff returned to Centura Orthopedics complaining about pain in both of her shoulders and her left knee and again saw NP Finnegan. AR 600. Plaintiff reported that "her shoulder was never better following her last surgical intervention." *Id.* NP Finnegan ordered x-rays of both shoulders which revealed glenohumeral joints to be well-maintained and in good alignment; evidence of bilateral acromioclavicular joint osteoarthritis, left greater than right; Type II acromion noted bilaterally; and no evidence of acute fracture or dislocation. AR 601. On examination, NP Finnegan noted significant limitation with the left shoulder range of motion secondary to pain; generalized weakness to bilateral upper extremities; decreased sensation with scratch test to the left lateral arm, forearm, and index finger; and intact right shoulder range of motion. *Id.* Plaintiff received a cortisone injection in the left shoulder but declined one for the right shoulder. *Id* NP Finnegan ordered for the knee physical therapy to stop. *Id.*

On January 11, 2019, Plaintiff returned to Centura Orthopedics for left upper extremity numbness and neck pain and was seen by John Ho Pak, M.D. AR 606. He noted abnormal neck rotation to the left and right; an inability to extend or flex neck; and neck tenderness on palpitation. AR 610.

Plaintiff was seen by Dr. Simpson on March 8, 2019 for a follow-up on the bilateral ankle pain. AR 706. When examined, Plaintiff exhibited tenderness on palpitation along the lateral aspect of the foot and posterior tibial tendon. *Id.* Dr. Simpson did not find that Plaintiff was a surgical candidate. *Id.* However, Dr. Simpson discussed with Plaintiff the "benefit from some pain management intervention including nerve blocks therapy and bracing" as well as weight loss. *Id.*

Bryant Reinking, PA-C referred Plaintiff to physical therapy for neck pain and left upper extremity numbness after reviewing an EMG that was performed by Thomas E. Bowser, M.D. on April 11, 2019. AR 715. The impression following the EMG was moderate to severe right ulnar

neuropathy at the elbow and no electrodiagnostic evidence of either right or left carpal tunnel syndrome radial nerve injury, peripheral neuropathy or cervical radiculopathy. *Id.* The testing for the left was limited "due to severe shoulder pain with movement." *Id.*

Finally, Plaintiff was referred to physical therapy for chronic pain of the left knee and primary osteoarthritis of the left knee in November 2018. AR 696. Plaintiff went to Strive Physical Therapy. AR 685. The treatment note from December 13, 2018 indicates Plaintiff had improved tolerance to manual techniques but had max guarding with attempts at passive knee extension. *Id.*

To allow a doctor to run diagnostic tests, Plaintiff was placed on a medical hold on December 18, 2019. AR 681–82.

### III.   Hearing Testimony

At the hearing on April 24, 2019, Plaintiff (who appeared with counsel) and a vocational expert ("VE"), Douglas Prutting, testified. AR 37. After confirming with Plaintiff's counsel that there were no objections to the exhibits (AR 38–39), the ALJ asked counsel if there was anything else to tell him about Plaintiff's claim. AR 42. Counsel responded that the arguments were contained in the prehearing brief, but there was a mistake on "GRID-ing out" in which, based on Plaintiff's age, "she would GRID out with a light exertional level." *Id.* Counsel had mistakenly put "sedentary" in the prehearing brief. *Id.* The ALJ acknowledged the mistake and thanked counsel for pointing it out. *Id.*

Following this exchange, the ALJ proceeded to question Plaintiff, who testified that she lived in a house with her sister, brother-in-law, and niece. AR 43. She explained that she had a car at one point, but it was repossessed. AR 44. Nevertheless, her brother was fixing a car for her to have, and she had a driver's license. *Id.* When asked if she is able to drive, Plaintiff responded that she is "if [she is] not hurting so bad." *Id.* She stated that she drove herself to the hearing. *Id.* The

ALJ then asked Plaintiff about her ability regarding bathing, dressing, and cooking. AR 45. Plaintiff responded that her sister and the use of a shower bench help her bathe, and that she sometimes cooks for herself, generally using the microwave. *Id.* She responded affirmatively to the question of whether she can clean up after herself. *Id.* Plaintiff answered "sometimes" on whether she does her own laundry and shopping. *Id.*

When asked what kinds of things she does during the day, Plaintiff told the ALJ that she tries to relive her pain by laying in bed with an ice pack and heating pad and using elevation and pain medications. AR 45–46. Plaintiff explained that she could not attend church because it hurt too much to sit through the sermon. AR 46. Plaintiff used to have hobbies that included playing volleyball, walking for exercise, flowering in the yard, and doing yard work. *Id.* The ALJ asked Plaintiff if she had a garden, but Plaintiff said she did not because she is not able to put flowers in one. *Id.* She reads about once a week but cannot finish most books because it hurts "too much to be seated with [them]." AR 46–47. The one exception is the Bible which she reads every day for about twenty minutes. AR 47. Subsequently, the ALJ asked about Plaintiff's prior work history which included working as a Certified Nursing Assistant (though she was no longer current on her license), a clerk at the post office, and various roles (courtesy attendant, valet, cashier, and dispatcher) for a hospital. AR 48–53.

Plaintiff testified that while she was working as a cashier, she tripped on a curb, fell, and injured herself on March 8, 2016. AR 53. From this, Plaintiff had two surgeries on her left rotator cuff, suffered a fractured foot and ankle, and "pretty much banged up [her] left knee too." *Id.* The ALJ inquired about any workers' compensation claims, to which Plaintiff indicated that the workers' compensation doctor said that she was able to go back to work. AR 53–54. Plaintiff attempted to return to work in March but "couldn't stay," so her employer "decided to just let [her]

go." AR 54. The ALJ then asked about the problems Plaintiff believed prevented her from doing any work at all. *Id.* Plaintiff said that she had pain all over but emphasized her ankles and shoulder as particularly painful. *Id.* Plaintiff and the ALJ engaged in discussion regarding what treatment Plaintiff has undergone and what treatment, if any, doctors were recommending going forward. AR 54–57.

In response to her attorney's questions, Plaintiff testified about her needing to lay down and stay off her feet to help with her ankle pain; taking medication for blood pressure and to help with the swelling in her ankles; having shooting pain in her neck down to the back of her shoulder that occurs the majority of the time; having swelling in her hands; suffering from numbness and tingling in her right arm the majority of the time; trying therapy on her left knee but having to stop from the pain in her ankles; getting only four or five hours of sleep per night; and having someone to help transport her to appointments. AR 57–61.

The ALJ proceeded to ask Plaintiff questions about her mental health treatment. AR 61. Plaintiff's counsel confirmed that Plaintiff is not alleging any mental health impairments. *Id.*

The ALJ then turned to the VE, Mr. Prutting,[1] who had listened to Plaintiff's testimony and testified that an individual with Plaintiff's age, experience and education and the following limitations —

> [L]ift and carry twenty pounds occasionally, ten pounds frequently. They can sit for six hours in an eight-hour day. They can occasionally climb ramps and stairs. Never climb ladders, ropes, or scaffolds, Occasionally balance, stoop, crouch, kneel, and crawl. This individual can occasionally reach overhead bilaterally. Never work at unprotected heights or around moving and/or dangerous machinery.

— could perform Plaintiff's past jobs of valet, cashier, and postal clerk. AR 63–64.

_____

[1]Plaintiff did not object to the VE's qualifications to testify. AR 63.

The ALJ altered the hypothetical to "change the stand and walk to four hours in an eight-hour day." AR 64. Mr. Prutting testified that an individual with that limitation could no longer perform any of Plaintiff's past work. *Id.* The ALJ inquired specifically as to the cashier position, to which Mr. Prutting responded that he has "seen very few cashier positions where they're allowed to sit." AR 65. Next, the ALJ asked about the concept of transferability of job skills. *Id.* The VE stated that there would be no job skills that would transfer from Plaintiff's past work that would fit within the second hypothetical given. *Id.* He also stated that employers customarily tolerate less than ten percent of a normal workday for employees to be off task and less than one per month (or no more than nine per year) for unexcused or unscheduled absences. *Id.* When asked about customary breaks and rest periods, the VE testified that employers generally permit "three breaks per workday, two hours apart, first and last ten to fifteen minutes, and the meal break which is the intermediary, thirty to sixty minutes depending on the employer." *Id.* The ALJ asked if exceeding these customary limits on a regular basis would eliminate all jobs in the competitive workplace, which the VE concluded it would. AR 65–66. To close the hearing, Plaintiff's counsel was offered the opportunity to ask the VE questions but declined. AR 66.

The ALJ issued an unfavorable decision on May 17, 2019. AR 10–18.

## LEGAL STANDARDS

To qualify for benefits under Sections 216(i) and 223 of the Social Security Act, an individual must meet the insured status requirements of these sections, be under age 65, file an application for SSDI and/or SSI for a period of disability, and be "disabled" as defined by the SSA. 42 U.S.C. §§ 416(i), 423, 1382.

## I.      SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step one determines whether the claimant is presently engaged in substantial gainful activity. If she is, disability benefits are denied. *See* 20 C.F.R. §§ 404.1520, 416.920. Step two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant is unable to show her impairment(s) would have more than a minimal effect on her ability to do basic work activities, she is not eligible for disability benefits. *See* 20 C.F.R. 404.1520(c). Step three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).  If the impairment is not listed, she is not presumed to be conclusively disabled. Step four then requires Plaintiff to show her impairment(s) and assessed residual functional capacity ("RFC") prevent her from performing work she has performed in the past. If the claimant is able to perform her previous work, the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(e), (f), 416.920(e) & (f). Finally, if the claimant establishes a prima facie case of disability based on the four steps as discussed, the analysis proceeds to step five where the SSA Commissioner has the

burden to demonstrate the claimant has the RFC to perform other work in the national economy in view of her age, education and work experience. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g).

## II.     Standard of Review

The Court's review is limited to whether the final decision is supported by substantial evidence in the record as a whole and whether the correct legal standards were applied. *See Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Thus, the function of the Court's review is "to determine whether the findings of fact . . . are based upon substantial evidence and inferences reasonably drawn therefrom. If they are so supported, they are conclusive upon the reviewing court and may not be disturbed." *Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d 28, 31 (10th Cir. 1978).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. . . . However, [a] decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citations omitted). In addition, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards. *Id.* (citing *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996)). But, in all cases, the Court may not reweigh the evidence nor substitute its judgment for that of the ALJ. *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

## <u>ALJ's RULING</u>

The ALJ ruled that Plaintiff did not engage in substantial gainful activity since March 13, 2017 (step one). AR 12. Further, the ALJ determined that Plaintiff had the following severe

impairments: morbid obesity, degenerative joint disease of the left shoulder, osteoarthritis of the right shoulder, degenerative disc disease of the cervical spine, tendonitis of the ankles, fracture of the metatarsal of the left foot, and osteoarthritis of the left knee (step two). *Id*. He found Plaintiff's medically determinable impairment of depression did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work activities and classified it as "non-severe." AR 13. Next, the ALJ found Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (step three). AR 14.

> The ALJ then determined that Plaintiff had the residual functional capacity ("RFC")
>
> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can lift and carry twenty pounds occasionally and ten pounds frequently. She can sit for six hours in an eight-hour day and stand and/or walk for six hours in an eight-hour day. She can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds. She can occasionally balance, stoop, crouch, kneel, and crawl. She can occasionally reach overhead bilaterally. She can never work at unprotected heights or around moving and/or dangerous machinery.

AR 14. The ALJ found that Plaintiff is capable of performing past relevant work as a valet, cashier, and postal clerk (step four), and that this work did not require the performance of work-related activities precluded by Plaintiff's RFC. AR 18. As a result, the ALJ concluded that Plaintiff was not disabled and, therefore, was not under a disability as defined by the SSA. *Id*.

## ISSUES ON APPEAL

Plaintiff seeks relief in the form of reversing the Commissioner's final decision and awarding her disability benefits or, alternatively, remanding the case for the Commissioner to reassess Plaintiff's RFC. ECF 23 at 32. On appeal, the Court is authorized solely to review whether the ALJ's decision is supported by substantial evidence in the record as a whole and whether the ALJ applied the correct legal standards. *Williamson*, 350 F.3d at 1098; *White*, 287 F.3d at 905. As

described in Plaintiff's opening brief, she alleges the following errors: (1) whether the ALJ's RFC determination is based on substantial evidence; and (2) whether the ALJ failed to include the effects of Plaintiff's conditions when imposing hypotheticals to the vocational expert.

## ANALYSIS

## I.     ALJ's Decision is Based on Substantial Evidence

Plaintiff argues that the ALJ's decision is not based on substantial evidence because he relied solely on a select number of treatment notes that supported his finding and ignored other evidence that would support a finding of disabled. ECF 23, Op. Brief at 24. Additionally, Plaintiff alleges the ALJ erred in not using the three-step analysis for evaluating subjective pain as stated in *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987).

a.     Generally

The ALJ's ruling indicates he carefully considered the entire record and found Plaintiff to have the RFC to perform light work. AR 14. Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In reaching this conclusion, the ALJ relied, in part, on the prior administrative medical findings of Drs. Jeanine Kwun, M.D. (who reviewed evidence through September 2017) and Yvonne Post, D.O. (who reviewed evidence through November 2017). AR 16. Both doctors found that Plaintiff could perform a reduced range of medium work.[3] AR 16–17. However, the ALJ did not accept these opinions in full, as evidenced by his tempering of the work

---

[3] Medium work "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

Plaintiff was able to do from medium to light. Put differently, the ALJ found Plaintiff to be more limited than either Drs. Kwun or Post found. The ALJ did so based on his taking "into account the [Plaintiff's] subjective complaints of pain, as well as her use of medication, including opioids." AR 17.

In reaching his ruling, the ALJ noted several abnormalities in Plaintiff's medical imaging and clinical tests. AR 15. These abnormalities included, but were not limited to, some degenerative changes in the AC joint of the left shoulder, a flatfoot deformity, mild arthritic changes and tendonitis, and the neurological testing that showed neuropathy and neurogenic changes in both Plaintiff's cervical and lumbar spine. AR 15–16 (citing AR 16, 511, 524, 559–78, 595–615, 679– 92). The ALJ also described medical records showing loss of range of motion in Plaintiff's neck and shoulders, general weakness, and the multiple complaints to her medical providers about pain. AR 16. After reviewing these records, the ALJ concluded that the "evidence certainly shows objective clinical evidence confirming" Plaintiff's severe impairments. *Id.*

However, he also noted that "many of the findings on imaging were mild to moderate in nature." *Id.* The ALJ pointed to the fact that Plaintiff generally walked independently without an assistive device with an antalgic gait, and her motor and cerebellar functions were generally preserved. *Id.* Additionally, while recognizing the abnormalities as mentioned above, the ALJ also looked at evidence that may support a finding that Plaintiff was less limited overall than alleged. *Id.* These included Plaintiff's foot fracture having healed without complication by May 2016 and being released to work by February 2017; Dr. Carney having returned Plaintiff to work without restrictions as of April 2017, finding "no reason to curtail her activity;" Plaintiff having full strength in her upper and lower extremities as of April 2018; Plaintiff being full weight bearing and walking with only a slight limp by August 2018; and Plaintiff having no significant objective

signs of worsening on a musculoskeletal examination in January 2019. *Id.* Further, as already mentioned, he considered the opinions of Plaintiff's workers' compensation physicians, including Dr. Carney, who released Plaintiff back to work without restrictions. AR 16–17. But in doing so, he also found the workers' compensation opinions to not be "entirely persuasive because they did not take into account the totality of the [Plaintiff's] impairments and instead focused on specific injuries." AR 17. After reviewing the evidence and weighing the relevant opinions, the ALJ concluded that Plaintiff's "allegations that she is incapable of all work activity due to the alleged limitations to [not] be consistent with the other evidence of record . . . ." *Id.*

To the extent Plaintiff alleges the RFC determination was deficient because the ALJ failed to adequately address Plaintiff's subjective pain, the Court will address that below. But, in general, the Court finds that the ALJ's RFC analysis is based on substantial evidence. After all, "[s]ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Frantz v. Astrue*, 509 F.3d 1299, 1300 (10th Cir. 2007). In the RFC analysis, the ALJ "must consider the combined effect of all of the claimant's medically determinable impairments . . . ." *Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013) (citing 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2)). In other words, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Id.* (citation omitted).

The ALJ considered all of the medical evidence, including treating physicians' opinions, along with prior administrative findings and found that Plaintiff could perform light work. No physician found Plaintiff to be more limited than the ALJ found. To suggest that the ALJ's decision is not based on substantial evidence essentially is to ask the Court to reweigh the evidence. The Court must not do so. *See Williams v. Barnhart*, 178 F. App'x 785, 787 (10th Cir. 2006) ("We do

not reweigh the evidence or retry the case . . ."). Even if one does not agree with the outcome, a reasonable mind can accept that the evidence supports the ALJ's conclusion, and it is certainly based on more than a mere scintilla of evidence. *Zhu v Comm'r, SSA*, 2021 WL 2794533, at *3 (10th Cir. July 6, 2021) ("'[T]he threshold for such evidentiary sufficiency is not high,' but it is 'more than a mere scintilla.'") (citation omitted); *see also Cortez v. Astrue*, 848 F. Supp. 2d 1302, 1307 (D. Colo. 2012) ("Although the evidence may support two inconsistent conclusions, that 'does not prevent an administrative agency's finding from being supported by substantial evidence.'") (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

b.    Subjective Pain

In *Luna v. Bowen*, the Tenth Circuit recognized that "subjective" evidence of pain must be properly evaluated by the ALJ. 834 F.2d 161, 165–166 (10th Cir. 1987). Regulations also explicitly state that "subjective" evidence "will be taken into account." 20 C.F.R. § 404.1529(3). Several factors the ALJ should consider regarding subjective reports are listed in those regulations. *Id*. However, the Tenth Circuit "does not require a formalistic factor-by-factor recitation of the evidence . . . [s]o long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility." *Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009). Social Security Ruling (SSR) 16-3p provides that the ALJ, "[i]n considering the intensity, persistence, and limiting effects of an individual's symptoms," is to consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."

"The ALJ is charged with carefully considering all the relevant evidence and linking his findings to specific evidence." *Barnett v. Apfel*, 231 F.3d 687, 689 (10th Cir. 2000) (citing *Clifton*,

79 F.3d at 1009–10 (holding the "record must demonstrate that the ALJ considered all of the evidence," and the ALJ must "discuss[ ] the evidence supporting his decision, . . . the uncontroverted evidence he chooses not to rely upon, [and] significantly probative evidence he rejects")). "[F]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Romero v. Colvin*, 563 F. App'x 618, 620 (10th Cir. 2014) (quoting *Wilson v. Astrue*, 602 F.3d 1136, 1144 (10th Cir. 2010)).

The ALJ noted in his RFC analysis that he had "considered all symptoms" and "medical opinion(s) and prior administrative medical finding(s) in accordance" with 20 CFR 404.1529, 416.929, SSR 16-3p, 404.1520c, and 416.920c. AR 14. As described earlier, the ALJ then thoroughly detailed Plaintiff's medical symptoms and history. AR 15–17. At the end, he wrote:

> In sum, the claimant alleged multiple physical and mental symptoms; however, Social Security Regulations provide that an individual's subjective complaints shall not alone be conclusive of evidence of disability. Instead, there must be medical signs and findings established by medically acceptable diagnostic techniques. These signs and findings must show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities that could reasonably be expected to produce the pain or other symptoms alleged and would lead to a conclusion that the claimant is under a disability. The medical evidence in this case revealed the claimant has the above-mentioned impairments, which cause some limitations. Thus, the undersigned reduced the residual functional capacity to accommodate limitations resulting from these conditions. However, the undersigned did not find the claimant's allegations that she is incapable of all work activity due to the alleged limitations to be consistent with the other evidence of record in light of the reasons outlined herein.

AR 17.

Based on the ALJ's decision, the Court does not agree with Plaintiff that he failed to adequately consider her allegations of pain. True, "the ALJ did not explicitly state 'I find this statement credible' or 'I find this statement not credible' for each factual assertion." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1169 (10th Cir. 2012). Yet, such a "formalistic factor-by-factor recitation of the evidence" is not required. *Poppa*, 569 F.3d at 1171. The ALJ has not erred so long

as he "sets forth the specific evidence he relies on in evaluating the claimant's credibility." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000). The ALJ has done so here. The ALJ summarized Plaintiff's testimony and subjective beliefs (including recognition that Plaintiff asserted she was "in constant pain"), spent several pages describing the evidence in the record, noted inconsistencies when appropriate (including that the workers' compensation physicians released Plaintiff back to work without restriction), and concluded that Plaintiff's allegations were not consistent with the totality of the evidence.[4] The Court finds that the ALJ's decision is supported by substantial evidence, and the Court will not reweigh the evidence to reach a different outcome.

## II.     ALJ Did Not Err in Imposing Hypotheticals

Plaintiff's argument that the ALJ erred in his hypotheticals is multi-fold. First, the ALJ erred in not including Plaintiff's nonsevere impairments in the RFC determination and therefore failed to include them in his hypotheticals to the VE. Second, the ALJ did not discuss the effect of Plaintiff's pain on her ability to perform work activities. Third, the ALJ did not "include any limitations reflecting the impingement of both shoulders, CTS of the right arm, OA, tendinitis and tendinosis of both ankles, or peripheral neuropathy." Op. Brief at 31. On all counts, the Court disagrees.

The hypothetical questions posed to the VE "must reflect with precision all of [Plaintiff's] impairments, but they need only reflect impairments and limitations that are borne out by the evidentiary record." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (internal citations omitted). Here, the ALJ's first hypothetical to the VE was, more or less, for the full range of light

---

[4] After all, "disability requires more than mere inability to work without pain." *Brown v. Bowen*, 801 F.2d 361, 362 (10th Cir. 1986); *see also Turner v. Colvin*, 2013 WL 5511462, at *8 (N.D. Ill. Oct. 4, 2013) ("[A]n individual does not have to be pain free to have the residual functional capacity to engage in substantial gainful activity.").

work. He asked the VE if the hypothetical individual could perform any of Plaintiff's past work, to which the VE responded affirmatively and identified the valet, the cashier, and the postal clerk. The ALJ then posed a second hypothetical, changing the first hypothetical to the ability to stand or walk for only four hours a day. The VE testified that restriction would eliminate the ability to do Plaintiff's past work. Those were the only two hypotheticals imposed by the ALJ. After the second hypothetical, the VE confirmed he was familiar with the concept of transferability of skills and testified that there were no jobs that would transfer from Plaintiff's past work to the second hypothetical. Finally, the ALJ inquired about the tolerance of employers for their employees to be off task or be absent from work, to which the VE testified that employers would tolerate less than ten percent of an employee being off task and would tolerate absences that were less than one per month (or no more than nine per year).

Despite Plaintiff's arguments to the contrary, the Court has found that the ALJ's ruling is supported by substantial evidence. In this case, because the Court has found the decision to be based on substantial evidence, the Court also finds the ALJ's hypotheticals generally reflect the appropriate impairments and limitations. *See Newbold v. Colvin*, 718 F.3d 1257, 1268 (10th Cir. 2013) (finding ALJ's determination "enjoys substantial evidentiary support" and, "[a]s such, the ALJ's hypothetical adequately reflected the 'impairments and limitations that [were] borne out by the evidentiary record.'" (quoting *Decker*, 86 F.3d at 955)). The ALJ imposed restrictions on, among other things, lifting and standing. These restrictions reflect the ALJ's findings as it relates to Plaintiff's shoulders and ankles. Plaintiff does not explain what limitations in the hypotheticals failed to account for her nonsevere impairments. The ALJ is not required to provide an individual breakdown of all of her symptoms in imposing hypotheticals. *Vigil v. Comm'r, SSA*, 755 F. App'x 816, 821 (10th Cir. 2018) (finding ALJ was not "obliged to specifically include each individual

symptom and diagnosis in the hypothetical"). All that is required is that hypothetical reflect the impairments and limitations borne out by the record. The Court finds the hypotheticals in this case do just that.

## CONCLUSION

The mere presence of medical impairments is insufficient to establish disability; rather, Plaintiff must show that she had limitations severe enough to prevent her from engaging in substantial gainful activity. 20 C.F.R. § 404.1509; *Barnhart v. Walton*, 535 U.S. 212, 218–19 (2002). In sum, the Court concludes that the ALJ properly considered all relevant evidence in the record, his decision was supported by substantial evidence, and he committed no legal error in determining that Plaintiff was able to engage in substantial gainful activity. Accordingly, the decision of the ALJ that Plaintiff was not disabled (as defined by the SSA) since March 13, 2017 is AFFIRMED.

SO ORDERED.

Dated this 10th day of February, 2022, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty

Michael E. Hegarty
United States Magistrate Judge